IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **JOSEPH E. BROWN,** | ) |
| | ) |
| **Plaintiff,** | )     **No. 03 C 2171** |
| | ) |
| **v.** | )     **Magistrate Judge Maria Valdez** |
| | ) |
| **UNION PACIFIC RAILROAD COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Through a three-count complaint, plaintiff Brown sues his former employer, Union

Pacific Railroad Company ("UPRR"), for alleged violations of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. § 621 *et seq.,* and "state common law of retaliatory discharge."[1]  On June

11, 2003, the parties consented to the jurisdiction of the United States Magistrate Judge pursuant

to 28 U.S.C. § 636(c).

Before the Court are two separate, but interrelated, motions.  The first is the defendant's

Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment [38].  The second is

the plaintiff's Rule 15 motion for leave to amend the Complaint [60] with a fourth count under

the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 207, 215(a)(2), 216.  Each side

opposes the other's motion.  For the reasons set forth below, the Court denies the plaintiff's

---

[1] Defendant construes the Complaint as silent on whether Count III, which seeks recovery for alleged
"constructive retaliatory discharge," is brought under federal law or as a state action under the Court's supplemental
jurisdiction. (Def. Mot. Summ. J. 2.)  However, as Plaintiff concedes that Count III is "based upon state common
law" (Pl.'s Mot. Leave Amend ¶ 1), the Court will construe Count III as such.

request for leave to amend and grants summary judgment as to Counts I & II in favor of the defendant. Without claims based in federal law, the Court accordingly declines to exercise jurisdiction over Count III, which is solely rooted in state law.

## I. Motion to Amend

As the time for responsive pleadings has passed, Brown may amend "only by leave of court or by written consent of the adverse party . . . ." Fed. R. Civ. P. 15(a). And as UPRR does not consent, the question becomes whether the Court should grant leave to amend, which as the rule provides "shall be freely given when justice so requires." *Id.* Notwithstanding the language of Rule 15(a), courts have long recognized that leave is inappropriate when there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment . . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Villa v. City of Chi.*, 924 F.2d 629, 632 (7th Cir. 1991); *Peoples v. Sebring Capital Corp.*, 209 F.R.D. 428, 429 (N.D. Ill. 2002). "Whether to grant or deny leave to amend is within the district court's discretion." *Campbell v. Ingersoll Milling Mach. Co.*, 893 F.2d 925, 927 (7th Cir. 1990) (citation omitted).

### A. Undue Delay

The defendant argues that the plaintiff's proposed amendment is the byproduct of undue delay and its allowance would unduly prejudice UPRR. Turning to undue delay, the defendant calls into question the plaintiff's timing; correctly noting that Brown did not file until *after*

Page 2

briefing on summary judgment was complete and less than two months remained until trial.[2] Delay, in and of itself, is normally an insufficient reason for a court to deny a motion for leave to amend. *Dubicz v. Commonwealth Edison Co.,* 377 F.3d 787, 793 (7th Cir. 2004) (citing *Perrian v. O'Grady,* 958 F.2d 192, 194 (7th Cir. 1992)). Though, delay that is coupled with another reason – such as prejudice to the non-movant – can be a basis to deny. *Dubicz,* 377 F.3d at 793.

"[T]he impetus for his request" (Pl.'s Reply to Def's Resp. to Mot. Leave Amend 3), the plaintiff offers, is the Seventh Circuit's recent decision in *Sehie v. City of Aurora,* 432 F.3d 749 (7th Cir. 2005). Brown asserts that prior to this opinion, the United States Department of Labor ("DOL") issued opinion letters that indicated an action for compensation for time an employee spent attending and traveling to and from employer-mandated counseling sessions as compensable hours worked under the FLSA "was not viable." (Pl.'s Mot. Leave Amend ¶ 5.) Thus, the plaintiff argues that *Sehie* resolves this conflict and stands for a clear cause of action for Brown under the FLSA. Brown's assertion is incorrect.

In *Sehie,* the Seventh Circuit declined to establish a general rule holding that regulations under the FLSA bar compensation when an employee complies with an employer's mandatory medical treatment order on non-work time. *Sehie,* 432 F.3d at 752, 754. Yet as the Seventh Circuit pointed out, there existed administrative opinions and regulatory authority, prior to *Sehie,* to support the legal position Brown seeks to press through his proposed, additional claim. Specifically, the circuit court noted, an employee seeking such compensation "can easily point [(1)] to other DOL opinions supporting her position," 432 F.3d at 753 (citing *Required Physical*

---

[2] At the time of the plaintiff's filing, the parties' pre-trial conference was set for February 2, 2006 and the standing date for trial was February 27, 2006.

*Examinations/Hours Worked,* Wages & Hours Manual (BNA) (Dep't of Labor, Oct. 7, 1997); *Police/Hours Worked,* Wages & Hours Manual (BNA) (Dep't of Labor, Aug. 2, 1989); *Hours Worked/Medical Exams,* WH-263 (Dep't of Labor, Apr. 4, 1973)) and (2) to 29 C.F.R. § 785.1, "another regulation pertaining to the FLSA, which supports a more expansive reading of [hours worked under the FLSA]," *Sehie,* 432 F.3d at 754.

Brown accurately states that the DOL released opinion letters foreclosing such recovery. *See id.* at 753 (citing *Hours Worked/Medical Certificates,* 6A Labor Relations Reporter, Wages & Hour Manual (BNA) at 99:5161 (Dep't of Labor, Mar. 12, 1987); *Firefighters/Hours Worked,* 6A Labor Relations Reporter, Wages & Hours Manual (BNA) at 99:5181 (Dep't of Labor, Sept. 10, 1987); *Opinion Letter Fair Labor Standards Act (FLSA),* 1994 WL 1004851 (Dep't of Labor, July 15, 1994) but finding reliance on these unpersuasive). However, in his motion for leave to amend, the plaintiff fails to recognize the two then-existing sources of authority supporting his theory of recovery: the opposite string of DOL opinions and 29 C.F.R. § 785.1. Thus, without *Sehie,* both the pro-recovery strand of agency opinions and federal regulation, at the very least, would have provided a basis for Brown to allege a FLSA claim.

*Sehie* does not stand for the reinstatement of a previously foreclosed legal theory. Nor does *Sehie* stand for a newly created theory of recovery. The Seventh Circuit avoided solidifying an across-the-board rule: "By no means does our [*Sehie*] ruling mean that every time an employer gets help for its employees, the employee must be compensated for hours worked." *Id.* at 752. As such, the Court sees no valid excuse why Plaintiff's counsel did not assert the FLSA claim from the get go.

Moreover, over the years, the Seventh Circuit has visited suspect timing close to and

worse than Brown's and upheld such similar circumstances as sufficient to deny requests to amend. *See, e.g., Bethany Pharmacal Co. v QVC, Inc.*, 241 F.3d 854, 861-62 (7th Cir. 2001) (finding an alternative basis for a district court to deny a request to amend under undue delay where requested additional claim was available to the plaintiff all along, but the motion to amend was filed on the same day the defendant moved for summary judgment); *Morissette v. Peters,* 45 F.3d 1119, 1123 (7th Cir. 1995) (per curiam) (concluding that a district court does not abuse its discretion for denial of a motion for leave to amend under undue delay that was filed "very late in the proceeding, when trial or resolution of the case via summary judgment was imminent"); *Cleveland v. Porca Co.,* 38 F.3d 289, 297-98 (7th Cir. 1994) (holding that a district court does not abuse its discretion in declining to allow the plaintiffs to amend under undue delay where they waited until after summary judgment motions had been fully briefed before moving to amend). Accordingly, the factors above lead this Court to decline Plaintiff's motion for leave to amend on grounds of inexcusable, undue delay. Furthermore, the Court also holds, as explained below, that an additional basis to decline Plaintiff's request is undue prejudice.

## B. Undue Prejudice to Defendant

Brown carries the burden of proving the proposed amendment will not be unduly prejudicial to UPRR. *Sitrick v. FreeHand Sys., Inc.,* No. 02 C 1568, 2004 WL 725306, at *4 (N.D. Ill. Mar. 31, 2004) (citing *King v. Cooke,* 26 F.3d 720, 724 (7th Cir. 1994)). Brown skirts his full burden by offering conclusory assertions, through his motion and reply, that no new discovery or delay would flow from an allowance of his proposed amendment.

Defendant counters that discovery to date is insufficient as to: (1) the number of counseling sessions Brown attended; (2) the total hours Brown spent in sessions; (3) the time

calculation around Brown's time traveling to and from the sessions; (4) the total time Brown temporarily halted his sessions due to an unrelated, intervening medical event. The defendant also argues that to properly defend and calculate damages it would need additional records and depositions. For example, Defendant contemplates seeking to subpoena third-party medical/mental institutions for records indicating the hours Brown spent in sessions and the extent they benefitted him.

Brown points to a subset of the defendant's Rule 26 disclosures (with attachments) and an exhibit affixed to the defendant's motion for summary judgment as sufficient to reach the issue of time calculation. Brown, however, is only partially correct. Review of the documents reveals the beginning and end dates of treatment and frequency of treatment within are captured. However, further review of the documents reveals they are silent as to total hours spent in each session and any related travel time involved. Yet, Brown makes clear he would, if allowed, seek full compensation for the "the time he was off work[,] which includes the time he was required to *travel to and attend* the four week sessions for out-patient counseling . . . ." (Pl.'s Mot. Leave Amend ¶ 3 (emphasis added).) On the issues of calculating travel time plus actual session time, the Court finds the current record is insufficient without supplemental discovery. The lack of discovery on these issues would likely necessitate subpoenas to third-party medical providers, adding an eleventh hour burden to the defendant and the Court.

Taken together, the considerations above lead the Court to decline the plaintiff's tardy motion for leave to amend on grounds of undue prejudice to the defendant. Likewise, the resulting prejudice spills over to the public interest. Courts have found encroachments on the public's interest in efficiently run tribunals also support the denial of motions to amend, with or

Page 6

without undue prejudice to a defendant. "The longer the delay in seeking leave to amend, the likelier is it both that the delay is inexcusable . . . and that granting leave to amend will, by further delaying the lawsuit, impair the public interest in the prompt resolution of legal disputes." *Tamari v. Bache & Co. S.A.L.,* 838 F.2d 904, 909 (7th Cir. 1988).

## *II. Court's Standing Order & Local Rules for Summary Judgment Motions*

At the outset, prior to analyzing the parties' facts and arguments for summary judgment, the Court finds it necessary to note the parties' incomplete compliance with both this Court's Standing Order on Summary Judgment ("standing order") and the District Court's Local Rule 56.1, both of which cover summary judgment burdens. While the Court recognizes the parties' substantial compliance, nonetheless the standing order's express language makes clear that this Court expects strict compliance with Local Rule 56.1. Moreover, the Seventh Circuit has "repeatedly held that a district court is entitled to expect *strict* compliance with [Local] Rule 56.1." *Ammons v. Aramark Unif. Servs. Inc.,* 368 F.3d 809, 817 (7th Cir. 2004) (emphasis added) (citing *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 527 (7th Cir. 2000); *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir. 1994)). As "[s]ubstantial compliance is not strict compliance," *Ammons,* 368 F.3d at 817, it follows that the parties fall short of the expected mark.

Under Local Rule 56.1, a movant must file "a statement of material *facts* as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law. . . . The statement . . . *shall* consist of *short* numbered paragraphs, including within each paragraph *specific* references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a)(3)

(emphasis added). As to a non-movant's response and statement of additional facts, courts in this districts have similarly construed Local Rule 56.1 to set out requirements for a non-movant that are identical to obligations imposed on a movant's statement of facts. *Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000). Thus, for movant and non-movant alike, "[t]hree operative concepts animate this rule: facts, short, and specific." *Malec,* 191 F.R.D. at 583.

Simply stated, Defendant in this matter struggles with the requirement of brevity while Plaintiff fumbles on specificity. For example, many of defendant UPRR's numbered paragraphs extend beyond a fair construction of the concept of "short." (*Compare* Def.'s LR 56.1(a) Stmt. ¶¶ 31, 59, 68 (asserting six propositions) *with* ¶¶ 44, 47, 65 (asserting one proposition).) In *Malec* the Court aptly noted, "numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response." 191 F.R.D. at 583. Similarly non-compliant, plaintiff Brown's statements of additional fact contained in paragraphs fifty-five through fifty-eight fail to point with specificity to their attached, unpublished authority. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 55-58 (citing Pl.'s Ex. D, Houlihan Aff. without pinpoint cites to relevant paragraph(s) supporting factual assertions).) "Factual allegations not properly supported by citation to the record are nullities." 191 F.R.D. at 583 (noting citations must be in proper Bluebook form and "include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document"); *accord Ammons,* 368 F.3d at 817-18 ("Citations . . . to a lengthy exhibit are not specific and are, accordingly, inappropriate.").

While the relevant standing order and local rule place litigants on notice that strict enforcement will follow, this Court will exercise discretion in the matter at hand to balance out some of the parties' respective shortcomings. Thus, in the case of Plaintiff's non-specific

reference to Houlihan's affidavit and Defendant offering lengthy paragraphs, the Court will simply admonish the parties to conform future filings to applicable standing orders and local rules.

The Court, however, will not cure the parties' other pleading imperfections. Courts are to consider general and argumentative denials to be insufficient, *Malec,* 191 F.R.D. at 584, and ignore submitted support not referred to in a statement of (additional) facts, *id.* at 583. Overall, the Court will not assume the duty to find specific references in the record that support the parties' proffered facts, responses, and denials. "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes . . . ." *Waldridge,* 24 F.3d at 922.

### III. Summary Judgment Standard

Familiar Rule 56 principles impose on movant UPRR the burden of establishing the lack of a genuine issue of material fact necessitating trail. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). At this stage, courts does not weigh evidence or determine the truth of matters asserted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Instead, courts must consider the evidentiary record in the light most favorable to the non-moving party and draw all reasonable inferences in their favor as well. *Ezel v. Potter,* 400 F.3d 1041, 1046 (7th Cir. 2005) (citation omitted). The general standard is also applied with rigor in employment discrimination cases, where intent is inevitably the central issue. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir. 1993) (citation omitted).

To avoid summary judgment non-movant Brown still "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists. *Pugh v. City of*

*Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (citation omitted). Nevertheless, if a non-moving party fails to make a sufficient showing on an essential element of their case, the moving party is entitled to judgment as a matter of law. *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 323).

## *IV. Facts*[3]

Brown is African American, who at the time leading up to this action was 60 years old. (Def.'s LR 56.1(a) Stmt. ¶ 1.) UPRR, a railroad company headquartered in Omaha, Nebraska, was Brown's employer. (*Id.* ¶¶ 2, 5.) Brown's tenure with UPRR was a long one; he worked for UPRR from 1967 until October 25, 2002. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 1; Def.'s LR 56.1(a) Stmt. ¶ 5.) Throughout his years of service, Brown worked as a conductor/foreman out of the Proviso Yard in Northlake, Illinois. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 1; Def.'s LR 56.1(a) Stmt. ¶ 5.) Since January 2002, Brown worked the night shift (7:30 p.m. to 7:30 a.m.) on a two-person crew. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 2, 3; Def.'s LR 56.1(a) Stmt. ¶ 21.)

As a railroad engaged in interstate commerce, UPRR is governed by various rules and regulations adopted by the Federal Railroad Administration ("FRA"), a United State Department of Transportation agency. (*Id.* ¶ 6.) The FRA, at all times leading up to this action, had in place detailed regulations regarding drug and alcohol testing of railroad employees.

In compliance with the FRA regulations, UPRR adopted a Drug & Alcohol ("D&A") Policy and mailed a copy to all employees, including Brown, when UPRR revised it in 1997. (*Id.*

---

[3] Unless otherwise noted, the following facts are undisputed and/or deemed admitted pursuant to Local Rule 56.1.

¶¶ 7, 8.) UPRR's D&A Policy provided that, "[e]mployees must not have any measurable alcohol in their breadth or in their bodily fluids when reporting for duty, while on duty, or while on company property." (*Id.* ¶ 9.) The parties agree Brown was familiar with the rules. (*Id.*)

In furtherance of UPRR's D&A Policy and the FRA regulations, UPRR periodically subjected its employees to random drug and alcohol testing. (*Id.* ¶ 11.) On October 25, 2002, a computer program randomly selected Brown's crew for testing and UPRR personnel informed Brown and his colleague to report for testing. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 3; Def.'s LR 56.1(a) Stmt. ¶ 22.) ADTS, UPRR's independent contractor at the time, and its employee William Bennett administered the testing of Brown and his co-worker on the evening of October 25th. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 4, 5; Def.'s LR 56.1(a) Stmt. ¶ 14.) Under the FRA regulations, Bennett was assigned to instruct and assist Brown and his fellow crew member in the testing process. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 4.)

Generally, random drug and alcohol testing at UPRR begins with the administration of a Breathalyzer, which involves the employee(s) breathing into a device for measurement of breath alcohol concentration. (Def.'s LR 56.1(a) Stmt. ¶ 16.) If a test produces a negative result, a urine sample is then requested. (*Id.*) If the initial Breathalyzer result is .02 percent or greater then a confirmation test is to be administered. (*Id.*) If the confirmation test results in a score less than .020 percent, nothing further is required of the employee. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 29.) Moreover, a test result less than .020 percent cannot be used as evidence in a company proceeding or as a basis for subsequent testing. 49 C.F.R. § 219.101(5); (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 33).

The FRA regulations impose requirements to be followed for the administration of a

confirmation test. (Def.'s LR 56.1(a) Stmt. ¶ 17.) These include that the employee must remain in the test area and under the observation of the person administering the test or a designated employer representative. (*Id.*) The person being tested is also prohibited for eating, drinking, belching, or putting anything in their mouth (including cigarettes and gum). (*Id.*) The federal regulations also require that the confirmation test be administered within a fifteen-to-thirty minute window after the initial test. (*Id.*) Should more than thirty minutes lapse, a confirmation test should proceed and not a second initial screening test. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 23.) Beginning a confirmation test after the thirty minute mark does not invalidate the screening or confirmation test. 49 C.F.R. § 40.251(g); (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 24, 30). Both federal and UPRR regulations required the employee to cooperate or face disciplinary action. *See* 49 C.F.R. § 219.107(a); (Def.'s LR 56.1(a) Stmt. ¶¶ 18, 19).

Bennett administered the initial Breathalyzer to Brown at 8:12 p.m. (*Id.* ¶ 23.) Brown's initially scored a blood alcohol concentration of .024 percent, which was above the allowed federal and UPRR concentration. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 9; Def.'s LR 56.1(a) Stmt. ¶ 23.) Following federal protocols, Bennett had a duty to advise (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 11) and did advise Brown a second Breathalyzer – a confirmation test – would be administered (Def.'s LR 56.1(a) Stmt. ¶ 23).

Bennett was to carry out a waiting period of at least fifteen minutes before conducting the confirmation test. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 12.) While Bennett was required to observe Brown (*Id.* ¶ 13), he failed to do so (*Id.* ¶¶ 14, 21). Bennett was also required to instruct Brown not to eat, drink, smoke, chew gum, or belch during the waiting period, but did not do so. (*Id.* ¶ 15.) Nevertheless, Brown did not remain at the testing site and left the building. (Def.'s LR

Page 12

56.1(a) Stmt. ¶ 24.) The parties are not in agreement as to whether Brown sought Bennett's permission to leave and/or smoke. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 16; Def.'s LR 56.1(a) Stmt. ¶ 24.)

Brown was eventually located between thirty to forty minutes after the initial test (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22) outside the building in a parking lot (Def.'s LR 56.1(a) Stmt. ¶ 25). The parties disagree whether Brown was found drinking soda and/or eating a candy bar, but do agree Brown had been smoking. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 16; Def.'s LR 56.1(a) Stmt. ¶ 26.) Brown was escorted back to the testing room where a second breath alcohol concentration test was administered at or around 9:11 p.m., fifty-nine minutes after the initial screening test. (*Id.* ¶ 27.) Brown's second test scored at .008 percent. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 28; Def.'s LR 56.1(a) Stmt. ¶ 27.) Bennett, however, conducted a second screening test rather than the follow-up confirmation test, as required. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 27.)

Newcom, a UPRR manager in Northlake, advised Stoner, the drug and alcohol testing manager for UPRR stationed in Omaha, of the delay and circumstances of Brown's testing. (*Id.* ¶ 38; Def.'s LR 56.1(a) Stmt. ¶ 29.) In his phone conversation with Stoner, Newcom neither raised Brown's race nor age. (*Id.* ¶ 32.) Stoner considered Brown's test started as a federal test because he was chosen randomly under the FRA regulations, but the test became a UPRR test when the initial breath test scored under .040 percent. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 34.) UPRR followed the same procedure and process for drug and alcohol tests whether under federal or UPRR policies. (*Id.* ¶ 37.)

Brown, then assigned to the night shift, admitted to Newcom to ingesting a couple of alcoholic drinks as a "sleep aid" before going to bed that morning. (Def.'s LR 56.1(a) Stmt. ¶

30.) Stoner directed Newcom to remove Brown from service under a supervisory referral (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 39) and refer Brown to UPRR's Employee Assistance (EA) Program for an evaluation for an alcohol problem and, if appropriate, treatment (Def.'s LR 56.1(a) Stmt. ¶ 31). Stoner had never met Brown and had no knowledge of either Brown's race or age when he made the decision to have Brown removed and referred for evaluation. (*Id.* ¶ 32.) Newcom informed Brown of his supervisory referral. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 40; Def.'s LR 56.1(a) Stmt. ¶ 34.)

The parties agree that Newcom did not have problems with Brown or his performance and never displayed animosity toward Brown. (*Id.* ¶ 60.) Similarly, Brown neither had a problem with Newcom nor believed that Newcom treated him unfairly because of age or race. (*Id.* ¶ 61.) Instead, Brown believed manager Michael Frederick was the supervisor who caused his removal from service (*Id.* ¶ 62) and that Frederick displayed a strong dislike for Brown because of his race and age (*Id.* ¶ 64). However, Newcom never consulted with Frederick and Frederick had no involvement in Brown's referral or return-to-work decisions. (*Id.* ¶ 63.)

On October 28, 2002, Stoner drafted a letter to Brown (under Newcom's name) memorializing Brown's removal from work, referral to EA, and his ineligibility to return to service until he completed the conditions the EA Program would institute. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 41, 43; Def.'s LR 56.1(a) Stmt. ¶ 34.) Brown complied and called the EA Program. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 51; Def.'s LR 56.1(a) Stmt. ¶ 35.) During the EA Program intake, Brown admitted that he consumed two shots of mash whiskey at 10:30 a.m. on the day of his test and denied having a problem with alcohol. (*Id.* ¶ 36.) The intake form contained notations as to Brown's age and race. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 52.)

UPRR's EA Program assigned Brown to an outside professional for evaluation. (Def.'s LR 56.1(a) Stmt. ¶ 37.) Brown was referred to John Houlihan, a clinical program manager with Rush Behavioral Health in Chicago, for the evaluation. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶54; Def.'s LR 56.1(a) Stmt. ¶ 38.) Brown admitted to Houlihan daily alcohol use, but denied a problem with alcohol. (*Id.* ¶ 38.) Per UPRR's referral and as a result of the evaluation, Houlihan recommended that Brown attend intensive, daily outpatient treatment over several weeks (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 56, 58) and then attend twelve-step program meetings (Def.'s LR 56.1(a) Stmt. ¶¶ 38, 40). Throughout, Brown was not allowed to return to work.

According to Houlihan's affidavit, Houlihan's *sole* rationale that Brown abstain from alcohol consumption was Brown's medical history of high blood pressure, diabetes, and a partially blocked artery. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 57.) Alcohol dependency was *not* a factor that influenced Houlihan's recommendation regarding Brown. (*Id.*) Specifically, Houlihan's recommended intensive outpatient treatment and aftercare plan – limited Alcoholics Anonymous ("AA") meeting attendance – were to "instill in him an awareness that use of alcohol was contraindicated based upon his medical history" and "provide a basis of support." (Houlihan Aff. ¶¶ 10, 17.) There is no indication that Houlihan's finding of no alcohol abuse was ever communicated to Curtis, UPRR's EA Program Manager assigned to Brown's case, or other UPRR officials.

Brown successfully completed his outpatient treatment program. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 55; Def.'s LR 56.1(a) Stmt. ¶ 42.) Brown was then required to attend AA meetings twice a week for a period of three months before he could return to work. (*Id.* ¶¶ 40, 42.) Throughout, there was no finding that Brown had an alcohol problem.

Curtis, the UPRR manager supervising Brown's return-to-work compliance from Texas, received a copy of reports compiled by Rush Behavioral Health and tailored a personal program for Brown's aftercare. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 60; Def.'s LR 56.1(a) Stmt. ¶¶ 42, 43.) Curtis structured Brown's personal program similar to Rush Behavioral Health's recommendation of two AA meetings a week for three months, but added a possibility of extension at the end of the three months. (*Id.* ¶ 42.)

On December 19, 2002, the Chicago facilitator of Brown's evaluation sent him a different personal program than Curtis crafted. (*Id.* ¶ 45.) On December 30, 2002, Brown objected. (*Id.*) Curtis then called Brown and apologized for the letter containing irrelevant language that did not apply – namely a future, positive test score after returning to work would result in a dismissal. (*Id.* ¶ 46.) Thereafter, UPRR sent a corrected letter clarifying that Brown would have another chance to return to work through an EA referral should there be a another, positive test. (*Id.* ¶ 47.)

In a letter dated January 27, 2003, Brown again objected to the revised personal program (*Id.* ¶ 48) and requested that Curtis "reinstate [him] immediately without unreasonable and unjustified conditions," (*Id.* ¶¶ 48, 49), or he would "be forced to take an early retirement pension in order to support [his] family," (*Id.* ¶ 49). On January 29th, Curtis advised Brown that the personal program was withdrawn and, instead, UPRR's EA program would recommend immediate reinstatement if Brown agreed to follow or show evidence of completion of the AA aftercare recommendation of Rush Behavioral Health. (*Id.* ¶ 51.)

Brown never advised Curtis he would comply with the final aftercare plan. (*Id.* ¶ 53.) Instead, Brown sent a letter, dated February 3, 2003, in which he asserted UPRR was using its

"economic power to force [Brown] to involuntarily leave Union Pacific" and take his pension. (*Id.*) The parties diverge on the import of the February 3rd letter; Brown claims February 3, 2003 as his termination date (Pl.'s LR Stmt. 56.1(b)(3)(B) Stmt. ¶ 63) and UPRR considers it the date of his resignation (Def.'s LR 56.1 Stmt. ¶ 5). Since Brown was over sixty and had more than thirty years of service, he was eligible for full retirement benefits. (*Id.* ¶ 58.) On February 14, 2003, Curtis wrote Brown again and reiterated the EA Program was ready to recommend reinstatement if Brown agreed to attend AA meetings twice a week for three months. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 63; Def.'s LR 56.1(a) Stmt. ¶ 54.)

There was no other UPRR employee working at the Proviso Yard who within six months before and after Brown's test that had an initial positive Breathalyzer followed by a negative confirmation test. (*Id.* ¶ 68.)[4] However, two other UPRR employees from other parts of the country were similar to Brown with regard to their testing. (*Id.*) Both were Caucasian and under forty years old. (*Id.*) Both of these employees were given referrals to the EA Program as well. (*Id.*) One (hereafter referred to as "K") was evaluated, found not to have a problem, and recommended for immediate return to work. (*Id.*) The other (hereafter referred to as "F") was evaluated, found to have a problem, sent to an inpatient program, and required to agree to an aftercare plan as a condition of a return-to-work recommendation. (*Id.*)

---

[4] Brown also points to the testimony of David Wells, albeit improperly. First, Brown failed to raise the relevant information contained in the affidavit of Wells through his Local Rule 56.1(b)(3)(B) statement of additional facts, the proper window for such an introduction. Second, Brown failed to cite the affidavit with specificity, as discussed above, making it a nullity. Finally, Brown impermissibly raised the Wells affidavit as part of his response to movant's Local Rule 56.1(a) statement of facts. Even assuming Brown had properly raised the Wells affidavit, the testimony of Wells fails on several markers of admissibility. Wells attests, in part, that he heard from unnamed parties that they too were released from service after only an initial screening test, but Wells does not recall the names of these alleged declarants. Wells statements amount to inadmissible hearsay and his lack of recall as to names evidences that Wells lacks the personal knowledge necessary to testify on the matter.

## V. Motion for Summary Judgment

### A. Title VII & the ADEA Claims - Individual Disparate Treatment

Brown claims that UPRR discriminated against him based on his race and/or age by removing him from service without cause on October 25, 2002 and imposing unrealistic burdens as a condition of return that effectively terminated his employment on February 3, 2003. These discipline and discharge actions, Brown contends, run afoul of Title VII and the ADEA. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2. The ADEA further provides that it is unlawful for employers "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[5]

To defeat UPRR's summary judgment motion on these claims, Brown must show discrimination under Title VII and the ADEA through direct evidence of intent to discriminate or comply with the indirect, burden-shifting method of proof articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Jordan v. City of Gary, Ind.*, 396 F.3d 825, 831-32 (7th Cir. 2005) (citation omitted) (Title VII); *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 794 (7th Cir. 2005) (citations omitted) (ADEA). Lacking direct evidence of ageist or racial animus, Brown must satisfy the *McDonnell Douglas* burden-shifting method of proof if he is to defeat

---

[5] The ADEA's protections, as amended, prohibit employer discrimination because of a person's age, whenever that individual is at least forty years old. *See, e.g., Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 590-600 (2004) (holding the ADEA is intended to protect older persons and does not prohibit granting additional benefits to that favor older workers).

Page 18

UPRR's motion. This method of analysis is applicable whether proceeding under Title VII or the ADEA. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003) (citation omitted).

Under *McDonnell Douglas*, Brown must first establish a prima facie case of discrimination. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) (citation omitted). If Brown meets his initial burden, the burden then shifts to UPRR to come forward with evidence of a legitimate and non-discriminatory reason for the employment decision. *Id.* If UPRR does so, Brown must rebut the proffered reasons as pretext for discrimination. *Id.* Throughout this burden-shifting, the ultimate burden of persuasion rests with the plaintiff. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005) (citation omitted).

Proceeding under the *McDonnell Douglas* analytical framework, Brown must show, by a preponderance of evidence, that (1) he is a member of the protected classes in question; (2) he was meeting UPRR's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) that UPRR treated similarly situated employees outside the protected class(es) more favorably. *See, e.g., Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002) (citations omitted) (Title VII and ADEA). Since both sides agree that Brown has met the first and third requirements, the Court turns to consider the record in the light most favorable to Brown related to prongs two and four.

### 1. Employer's Legitimate Expectations

Brown has two theories of discrimination to support his federal claims: discpline and discharge. Regarding discipline, the sole issue at this stage is the final prong of his prima facie showing. As to Brown's allegations that he was subject to disparate punishment – i.e., his

Page 19

removal from service and the terms of the EA referral – the second and fourth prongs of *McDonnell Douglas* merge. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004) (citing *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999)). Thus, Brown must only establish that he received dissimilar – and harsher – punishment than that received by a similarly situated employee outside each protected class. *Lucas*, 367 F.3d at 728 (citations omitted).

As to discharge, Brown carries the burden of establishing that he met his employer's *legitimate* expectations preceding his alleged termination. Critical to this inquiry, the Court is to look at the plaintiff's performance *at the time* of the employment action in question. *Moser*, 406 F.3d at 901 (citing *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998)). The employer's legitimate expectation "factor envisions a bifurcated inquiry, i.e., whether the employer's expectations were legitimate and if so, whether the employee was meeting those expectations." *Dale v. Chi. Tribune Co.*, 797 F.2d 458 (7th Cir. 1986), *cert. denied*, 479 U.S. 1066 (1987); *accord Stinneford v. Spiegel Inc.*, 845 F. Supp. 1243, 1247 (N.D. Ill. 1994) (noting communication of expectation and legitimacy of expectation are the main inquiries for courts).

The uncontested facts on the eve of Brown's "discharge" reveals that UPRR required Brown to complete Rush Behavioral Health's recommended aftercare – time-limited, twelve-step support group attendance – with a possibility of extension as a pre-condition to a return-to-work recommendation. Brown contested this determination. UPRR modified the applicable plan to only require completion of the three months of AA attendance. Brown refused. UPRR responded by modifying the plan again; this time to allow Brown to return to work sooner. As

Page 20

revised, Brown would have qualified for an immediate return-to-work recommendation if he agreed to complete the AA meeting attendance component within the first three months of his return. Brown did not accept. Instead, Brown contends that he was terminated and UPRR asserts that Brown resigned.

The record supports that UPRR clearly communicated (in writing) its expectations, albeit changing over time, to Brown regarding that the condition(s) precedent to it recommending his return to work. As such, both sides knew what the pre-condition(s) was/were at different steps of the timeline. They disagree, however, as to legitimacy of the condition(s).

Brown has sufficiently established facts to create a dispute as to whether the condition of support group attendance, whether prior to or contemporaneous with Brown's return, was a legitimate one. Brown cites to Rush Behavioral Health Manager Houlihan's concessions that (1) Brown did *not* have a problem with alcohol; (2) medical reasons *alone* accounted for the institution's recommendation that Brown cease future alcohol consumption; and (3) Rush Behavioral Health's twelve-step group attendance recommendation was aimed at assisting Brown find the support to abstain from alcohol consumption so as not to exacerbate his diabetes, etc.

Reasonable factfinders could disagree whether the record supports the legitimacy of an employer requiring AA meeting attendance for a non-alcoholic employee as a condition of retaining a job. Absent the AA-attendance requirement, it is undisputed that Brown met the other expectations of UPRR under his EA referral. As such, Brown has made a sufficient showing under the employer's legitimate expectation inquiry related to his discharge claim. The Court concludes there is a disputed issue of fact as to whether Brown met the "legitimate" expectations of his employer prior to his alleged termination date. And overall, prong two of

Page 21

*McDonnell Douglas* is satisfied for both Barth's discipline and discharge theories.

## 2. Similarly Situated Employees

"A similarly situated employee is one who is 'directly comparable to [the plaintiff] in all material respects.'" *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). In evaluating whether two employees are directly comparable, the Court is to look at relevant factors, the number of which depend on the context of the case. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citing *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000)).

The Court begins with Brown's discipline claim. The test for similarly situated in discipline cases, such as this, turns on a plaintiff evidencing "that he is similarly situated with respect to performance, qualifications, and conduct." *Radue,* 219 F.3d at 617 (citation omitted). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." 219 F.3d at 617-18 (citation omitted).

The record reveals that experience, education, and other qualifications were not part of UPRR's referral calculus. An employee's Breathalyzer test performance is what counted. And, all UPRR employees were subject to random drug and alcohol testing and held to the same federal standards, enlarging the universe of possible "similarly situated" employees for Brown.

Both sides in this matter concede that two unnamed employees – referred to by the parties as employees K and F – had supervisory referrals under similar circumstances and close in time

to Brown's referral. These two employees, who worked in states other than Illinois, were both Caucasian and under age forty at the time of their supervisory referrals.

The parties also concede that employees Brown, K, and F were subjected to the *same* standards. All three referrals were instigated by a screening result above the federal limit followed by a negative confirmation score.[6] The record also supports a finding that employees Brown, K, and F, for purposes of drug and alcohol testing, were accountable to the same UPRR manager under a common chain of command.[7] Stoner, the then-manager of UPRR drug and alcohol testing, worked in the Omaha headquarters of UPRR. Because of his job responsibilities, he presumably had supervisory authority over all employees related to testing regardless of worksite.

On the trigger to referral, no one outside Brown's protected classes was treated more favorably by UPRR. Similar test performances prompted referrals for each of the three. As to imposed conditions for return, employees Brown, K, and F faced different outcomes. For example, employee F was also evaluated by an outside counselor, but unlike Brown, F was found to have a substance abuse problem and required, in part, to complete inpatient treatment prior to F's return. However, in comparing Brown and K, the facts could support a finding of sufficient

___

[6] Neither party presents evidence as to "differentiating or mitigating circumstances," *Radue v. Kimberly-Clark, Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000), in the administration of UPRR's drug and alcohol testing of employees K and F as compared to Brown. *Cf. Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002) (upholding district court's conclusion that the lack of commonality in supervisors among employees subjected to the same evaluation policies and process that were exposed to the same centralized discipline process precluded inference of discrimination).

[7] "Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently." *Radue*, 219 F.3d at 618. Nevertheless, the Court will honor the defendant's fact concession that out-of-state employees K and F are similar to Brown and its proferred legal arguments construing all three employees as sufficiently similar under the similarly situated analysis.

similarity. Through outside assessments, both Brown and K were found *not* to have a substance abuse problem. However, while K was returned to work immediately, Brown was set on a course of outpatient and aftercare treatment that lengthened his path of return to work and placed greater conditions on him than K. A reasonable factfinder may very well conclude that Brown and K were similarly situated, and K (a younger, Caucasian) received favorable treatment. As to discipline, Brown has met his requisite showing on prong four of *McDonnell Douglas* and, moreover, carried his full prima facie burden.

Returning to the plaintiff's discharge theory, the similarly situated posture between Brown and K also assists Brown in his final showing as to discharge. The parties agree that K returned to work immediately after third-party assessors concluded K did not have an addiction. Brown's reliance on the Houlihan's affidavit is sufficient to raise a genuine issue of disputed fact as to what UPRR knew of before enforcing greater conditions on Brown than it did on K. Here too Brown carries the four element of *McDonnell Douglas.* Overall, Brown meets his burden of establishing a presumption of race and age discrimination, shifting the burden to UPRR to come forward with legitimate, nondiscriminatory reason(s) for its actions.

### 3. Legitimate, Nondiscriminatory Reasons & Pretext

"If the plaintiff establishes a prima facie case of age [or] race . . . discrimination, the employer, to avoid liability, must then produce a legitimate, nondiscriminatory reason for the adverse employment decision." *Cerutti,* 349 F.3d at 1061 (citing *Peele,* 288 F.3d at 326). The employer must come forward with "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993); *accord Hasham v. Cal. State Bd. of Equalization,* 200 F.3d

1035, 1044 (7th Cir. 2000). "Should the defendant do so, the inference of discrimination disappears and the plaintiff must then demonstrate by a preponderance of the evidence that the reasons proffered by the defendant were pretextual for intentional discrimination." *Hasham*, 200 F.3d at 1044 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 507).

UPRR advances several reasons for why it treated Brown in the manner it did. As to its reasons for referral, UPRR points to Brown's failure of the initial test, his subsequent leaving the test area, his failure to have his confirmation test within 15 to 30 minutes of the initial one, and the need for an independent professionals to determine if Brown had a problem with alcohol. As to its rationale for imposing conditions precedent on Brown's return, UPPR offers its adoption of the recommendation of the independent, outside substance abuse counselors. Finally, as to its reasons for Brown's failure to return, UPRR points to Brown's refusal to comply. The aforementioned rationales are legitimate and nondiscriminatory. *Cf. Nowak v. Int'l Truck & Engine Corp.*, No. 03 C 4971, 2005 WL 3487787, at \*11 (N.D. Ill. Dec. 19, 2005) (citation omitted) (recognizing even an employer's subjective belief can qualify as legally sufficient, legitimate, and nondiscriminatory). UPRR's reasons are supported by the record.

In light of these legitimate, nondiscriminatory reasons, the burden shifts back to Brown to prove pretext. When an employer proffers multiple reasons for its adverse employment decisions, as UPRR does, the employee must show that *all* of the proffered reasons are pretextual. *Ghosh v. Ind. Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1091-92 (7th Cir. 1999) (citation omitted); *accord Surratt v. Chi. Transit Auth.*, No. 03 C 2228, 2004 WL 2967447, at \*5 (N.D. Ill. Nov. 23, 2004) (citing *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395 (7th Cir. 1998)).

Page 25

The Seventh Circuit has "defined 'pretext' as a lie or a phony reasons for an employment decision," *Baron v. City of Highland Park,* 195 F.3d 333, 341 (7th Cir. 2000) (citation omitted), a justification unworthy of credence, *Gordon v. United Airlines, Inc.,* 246 F.3d 878, 888 (7th Cir. 2001) (citations omitted), or a factually baseless proffer, *Ajayi v. Aramark Bus. Servs., Inc.,* 336 F.3d 520, 534 (7th Cir. 2003) (citation omitted). Moreover, pretext requires more than a business decision that was "mistaken, ill considered or foolish." *Franzoni v. Hartmax Corp.,* 300 F.3d 767, 772 (7th Cir. 2002) (citation omitted). The Seventh Circuit has held that "so long as the employer 'honestly believed' the reason given for the action, pretext has not been shown." *Franzoni,* 300 F.3d at 772. Federal civil rights protections "sanction[ ] employers who discriminate, not those who are simply inept or incompetent." *Gordon,* 246 F.3d at 889.

And, to demonstrate pretext, a plaintiff must produce "significantly probative admissible evidence" from which the trier of fact could infer that the decisionmaker's reasons were false and that the actual reason(s) for the challenged actions was/were discriminatory. *Jones v. Union Pac. R.R. Co.,* 302 F.3d 735, 742-43 (citations omitted). An employee may prove pretext one of two ways: directly with evidence that an employer was more likely than not motivated by discriminatory animus or indirectly through evidence that the employer's justifications lack credibility. *Schuster v. Lucent Techs., Inc.,* 327 F.3d 569, 574 (7th Cir. 2003) (citing *Wade v. Lerner N.Y., Inc.,* 243 F.3d 319, 321 (7th Cir. 2001)).

Turning to this case, the Court holds that Plaintiff fails to demonstrate pretext in Defendant's proffered reasons for removing him from service, referring him for outside assessment, and placing conditions on his return. To begin, Plaintiff's Local Rule 56.1(b)(3)(B) statement appears not to offer facts tied to pretext. And, Brown's memorandum in opposition to

UPRR's summary judgment motion is equally puzzling as the plaintiff fails to fashion an argument as to pretext supported by the record. Brown's silence on this final front is fatal. Local Rule 56.1 statements are road maps and "without them, the court should not have to proceed further." *Waldridge*, 24 F.3d at 923. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

Throughout his pleadings and the available facts, Brown wholly fails to point to any evidence that the UPRR managers recommending referral (Stoner and Newcom) and supervising his return-to-work component (Curtis) acted with ageist and racial hostility and then covered their tracks. For example, Brown concedes that Newcom never treated him unfairly because of either his age or race and Stoner had no knowledge of Brown's race or age at the time of referral. Moreover, while Curtis at the very least had constructive knowledge of Brown's race and age, there is no indication that he acted dishonestly or with animus in the return-to-work decisions. Brown's reliance on facts related to testing administration missteps alone is insufficient for a factfinder to reach a finding of pretext. *See, e.g., Gordon*, 246 F.3d at 889.

Moreover, Brown's general assertion that unidentified UPRR officials "focused on forcing [P]laintiff to apply for his pension throught his ordeal" (Pl.'s Mem. Opp'n Def.'s Mem. Summ. J. 13), is unsupported by the available facts. The only manager that Brown asserts displayed a stronge dislike for him because of race and age was Frederick. But, Brown's reliance on Frederick's alleged animus is misplaced. First, Brown's assertion as to Frederick's purported bias is grounded solely on Brown's subjective belief. "[S]ubjective beliefs of the plaintiff, however, are insufficient to create a genuine issue of material fact." *McMillian v. Svetanoff*, 878

Page 27

F.2d 186, 190, (7th Cir. 1989) (citing *Andre v. Bendix Corp.*, 841 F.2d 172, 176 (7th Cir.), *cert. denied*, 488 U.S. 855 (1988)). Second, the parties agree Frederick played no part in Brown's referral or return-to-work supervision.

The ultimate burden of persuasion rests with Brown. *Moser*, 406 F.3d at 901 (citation omitted). As such, the Court concludes that Brown fails to raise from the available record an issue of disputed fact as to pretext. As a matter of law, the Court deems summary judgment is warranted.

## *Conclusion*

Plaintiff's motion for leave to file an amended complaint [60] is DENIED. Defendant's motion for summary judgment [38] is GRANTED and Counts I & II of the Complaint are DISMISSED with prejudice. The Court DECLINES to exercise supplemental jurisdiction over Plaintiff's remaining claim, which is hereby DISMISSED without prejudice. Further, the dates for pre-trial conference and trial in this matter are VACATED. The Court DIRECTS the Clerk of the Court to enter judgment accordingly.

**So ordered.**

Hon. Maria Valdez

8/7/06

Date